1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

7
8
9
10
11
12

JEROME JOHNSON,

     **Plaintiff,**

     vs.

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF PUBLIC HEALTH,

     **Defendant.**

Case No.: 11-CV-04113 YGR

ORDER ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT:  GRANTING DEFENDANT'S
MOTION; AND DENYING PLAINTIFF'S
MOTION

13
14
15
16

    *Pro se* Plaintiff Jerome Johnson ("Johnson") alleges that Defendant City and County of San Francisco Department of Public Health terminated his employment because the City regarded him as disabled due to Schizoaffective[1] Disorder.  Plaintiff alleges two claims based upon a perceived disability:  discrimination and retaliation.

17
    The parties have filed cross-motions for summary judgment.

18
19
20
    Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion.

21
**I.    BACKGROUND**

22
23
24
25
26
    Johnson is a former employee of the City and County of San Francisco's Department of Public Health.  The City and County of San Francisco Department of Public Health employed him for approximately ten years and, in total, Johnson worked for the City and County of San Francisco for nearly twenty years.  The City and County of San Francisco's Department of Public Health (hereafter "City") medically separated Johnson from his employment on May 21, 2010.  The basis

27
28

---

[1] Schizoaffective is defined as: "Having an admixture of symptoms suggestive of both schizophrenia and affective (mood) disorder."  STEDMAN'S MED. DICTIONARY (27th ed. 2000).

for the City's decision to terminate Johnson's employment centered on his inability to perform the essential job duties of his position.   In contrast, Johnson alleges that the City terminated him on the basis of discrimination and retaliation due to a perceived disability.  This lawsuit ensued.

### A.   EVENTS LEADING TO JOHNSON'S MEDICAL SEPARATION

In March 2008, Johnson sought and received a leave of absence from the City.  (Transcript of Deposition of Jerome Johnson ("Johnson Dep."), Dkt. No. 46-6, at 139:14-140:4.)  Johnson had been experiencing stress related to performing his duties as a case manager for the Family Mosaic Project.  (*Id.* at 140:25-143:24; *see also, id.* at 121:20-21, 123:9, 142:17-143:8 (discussing "very stressful" job "providing case management services to youth at risk of out of home placement," and "working with youth and families in violent communities").)  The Family Mosaic Project offers health care services to children between the ages of three and eighteen who have serious emotional disabilities and who are at risk of out-of-home placement.  Johnson's own stress was due in part to the deaths of two family members in 2007.  (*Id.* at 140:25-142:24.)

#### 1.   *Johnson exhibits erratic behavior.*

On September 8, 2008, Johnson returned from his leave of absence and resumed his duties as a case manager for the Family Mosaic Project.  Coworkers reported that Johnson was making highly provocative statements that implied threats of harm.[2]  For example, while referencing his manager, Julian Phillips, Plaintiff reportedly said:  "If Julian says anything else to me I'm going to hurt him ….  I told these folks I'm crazy."  (*See* Declaration of Michael Brown ("Brown Dec."), Pl's Ex. E, at ¶ 19.)  Johnson reportedly stated several times that "if you hear any popping, get out of the way," which his coworkers understood to be a comment about discharging a firearm in the office.  (*Id.* ¶¶ 19-20.)  Johnson also reportedly mentioned that he would bring his power saw to work.  (*Id.* ¶ 19.)  After coworkers reported that Johnson made these comments, the City counseled Johnson and reminded him of the City's policies regarding violence in the workplace.  (*Id.* ¶ 21.)

---

[2] Johnson does not dispute that his coworkers reported this behavior but, for the most part, he argues that they are lying.

United States District Court
Northern District of California

On September 30, 2008, Johnson visited the City's EEO/ADA[3] Coordinator, Veronica Lopez. (*See* Dkt. No. 50, Ex. C-1, October 1, 2008 Letter from Veronica Lopez to Jerome Johnson.)) At this meeting, Johnson communicated that he did not want to return to his current job with the Family Mosaic Project and wanted to work elsewhere in the City's Department of Public Health. (Brown Dec. ¶ 24; *id.*, Ex. C, May 21, 2009 Memorandum from Michael Brown to Emily Morrison.) Johnson also exclaimed "[y]ou people aren't helping me!" (*Id.*) Following this meeting, Ms. Lopez reported that she was very concerned for her safety in Johnson's presence. (*Id.*)

Johnson advised his supervisor that he was experiencing stress and could not continue working with the Family Mosaic Project. (Johnson Dep. at 125:11-127:3.) Johnson explained that he did not want to return to work in September 2008 because he was still experiencing stress, but his treating psychiatrist died and could not request a further extension of leave for Johnson. (Brown Dec., Ex. C; Johnson Dep. at 121:20-123:9, 125:24-127:3, 140:9-20.) The City authorized Johnson to resume his leave of absence from October 2008 until April 2009.

> 2. *Johnson returns to work and continues to exhibit erratic behavior.*

When Johnson returned to work in April 2009, the City assigned him to the Housing and Urban Health ("HUH") section of the Department of Public Health where he worked with the City's homeless population. Clients at HUH are chronically homeless and frequently suffer from chronic behavioral, health and medical issues. (Trotz Dec. ¶ 8.) The HUH section is responsible for housing patients that have severe mental illnesses and other chronic health problems. (*Id.*)

Johnson's position as a Health Worker III at HUH required him to assist in providing an environment best suited for this client population, which also required him to work collaboratively and effectively with the other caregivers at HUH. (*Id.* ¶ 9.) Johnson's essential job duties included: (1) communicating effectively in complex situations requiring patience, tact and diplomacy; (2) maintaining effective and cooperative working relationships based on an accurate understanding of others; (3) demonstrating effective interpersonal relationship skills; (4)

---

[3] EEO is used as an abbreviation for Equal Employment Opportunity and ADA is used as an abbreviation for Americans with Disabilities Act.

United States District Court
Northern District of California

1 communicating effectively with others, including being respectful and professional in those

2 communications; and (5) constructively interacting with supervisors, coworkers and patients.  (*See*

3 Pl.'s Resp. Statement, Dkt. No. 50, at 3.)

4 Johnson's coworkers at HUH reported that Johnson was acting erratically.  (*See* Brown Dec.

5 ¶ 32).  They described Johnson as volatile, angry, hostile and agitated.  (*Id*. ¶¶ 32, 35).  Coworkers

6 also reported that Johnson sometimes appeared to be in a catatonic state, that he avoided eye

7 contact, refused to engage during meetings, was seen pacing in the hallway and seemed incapable

8 of listening to others or understanding what they were explaining to him.  (*Id*.)

9 During a staff meeting on April 21, 2009, Johnson had a disagreement with Dr. Josh

10 Bamberger, the medical director for HUH.  (*See generally*, *id.*, Exs. E, F, G.)  Johnson planned to

11 input case notes into an online system but Dr. Bamberger told Johnson that the online

12 documentation system had not been set up so Johnson would need to write his notes on paper.  (*Id.*)

13 This upset Johnson.  (*Id.*)  He felt that Dr. Bamberger berated him because Johnson had arrived at

14 the meeting twenty minutes late.  (*Id.*)  Johnson also felt that Dr. Bamberger mocked and

15 disrespected him.  (*See* Johnson Dep. at 196:21-199:4.)

16 Johnson left work early that day, and did not show up for work on either of the next two

17 days, April 22 or April 23, 2009.  (*Id.* at 202:8-14.)  When Johnson returned to the office on Friday

18 April 24, 2009, Dr. Bamberger came by Johnson's office to talk to Johnson and to apologize.  (*Id.*

19 at 202:10-12.)  At approximately 10:00 a.m. that morning there was a staff meeting at which

20 Johnson was reportedly not engaged.  (*See* Brown Dec., Exs. E, F, G.)  After the meeting Johnson

21 was seen pacing about angrily.  (*Id.*)  Johnson left the office after the meeting and did not return

22 until Monday, April 27, 2009.  (*See* Johnson Dep. at 199:12-14, 202:10-203:17.)

23 On May 11, 2009, Johnson met with Michael Brown; two of Johnson's supervisors, Mike

24 Araiji and Ed Cotton; and the HUH Program Director, Marc Trotz, to discuss these reports of

25 Johnson's erratic behavior.  During the course of the meeting Johnson became loud, agitated, began

26 sweating profusely, spoke with a faster than normal speech pattern, and yelled without listening or

27 allowing anyone to finish speaking.  (Brown Dec. ¶ 37; Trotz Dec. ¶ 13.)  Johnson agrees that

28 during the course of the meeting he became very loud and very angry.  (Pl.'s Resp. Statement Facts

United States District Court
Northern District of California

United States District Court
Northern District of California

at 5; Johnson Dep. at 164:20-168:24.)  This behavior was consistent with the reports that Brown had received from Dr. Bamberger and Johnson's coworkers, and consistent with Johnson's reported behavior when Johnson had returned from his prior leave of absence in September 2008.  (Brown Dec. ¶ 38.)  After the meeting, Trotz authorized Brown to request placing Johnson on compulsory sick leave and to request a fitness for duty evaluation.  (*Id.* ¶¶ 7, 39; Trotz Dec. ¶¶ 13-14.)

Johnson was instructed not to return to work while the City pursued a Fitness for Duty examination.  By letter dated May 11, 2009, Michael Brown made a request for a Fitness For Duty Examination of Johnson.  (Brown Dec., Ex. B.)  Johnson was paid from May 11, 2009 through June 2, 2009, and effective that latter day, he was placed on compulsory sick leave.

> *3.     Fitness for duty evaluations.*

In June 2009, Elliot Henderson, Ph.D, evaluated Johnson and determined that he was not fit for duty.  (Brown Dec., Ex. A, attach. 2.)  Dr. Henderson was asked to evaluate whether Johnson was capable of performing his essential job duties as a Health Worker III.  (Brown Dec. ¶ 12.)  Plaintiff argues that Dr. Henderson diagnosed him with Schizoaffective Disorder.  Dr. Henderson's report, dated July 6, 2009, does not specifically indicate that diagnosis but does provide in part:

> Mr. Johnson was evaluated on June 08, 2009 and again on June 19th.  His behavior was dramatically different on the two occasions.  Given the explicit parameters concerning an employee's privacy rights, personal and health information will not be divulged.  Based upon obtained information, it is found that *Mr. Jerome Johnson possesses a psychiatric disorder.*  His condition interferes with his ability to perform the relevant duties and responsibilities of Healthcare Worker II [*sic*].  Mr. Johnson is incapacitated and *cannot perform his work functions. Consequently, he is not fit for duty.*  Mr. Johnson did not dispute these conclusions and nor [*sic*] did he articulate a wish for reevaluation in the future.  *He acknowledged that his condition is permanent.*

(*Id.*, Ex. A, attach. 2, at 2 (emphasis supplied).)

In August 2009, Johnson appealed the City's decision to accept Dr. Henderson's determination that Johnson was not fit for duty.  (Dkt. No. 50, Ex. H-1.)  In October 2009, Johnson submitted a three-sentence medical opinion from his personal physician that stated Johnson had no "physical limitations" that would prevent him from returning to work.  (Brown Dec., Ex. A, Dkt. No. 46-4, at 47.)  The document did not address Plaintiff's essential job functions.  Johnson also

United States District Court
Northern District of California

submitted a four-sentence psychological assessment from his personal therapist, W. Vernon Lee, Ph.D, which stated "[t]here are no mental health issues which prevent Mr. Johnson from returning to full-time employment." (*Id.*)  Again, the assessment did not address Plaintiff's essential job functions.  Moreover, while the fourth sentence of Dr. Lee's assessment offered a contact number for "further questions" (*see id.*), Plaintiff would not waive the privacy privilege.  (*See* Brown Dec., Ex. A, attach. 4, at 2.)

In November 2009, after receiving Johnson's appeal, Randall B. Smith, Ph.D, conducted a third evaluation of Plaintiff's fitness for duty.  (*See id.* at 1-2.)  Dr. Smith was provided with a list of the essential job requirements for Johnson's position and requested to provide a report on whether Johnson was capable of performing those job requirements.  (*Id.* at 1-3.)  Dr. Smith's report provides that there was "no evidence of cognitive difficulties" but that "psychological and emotional variables ha[d] interfered with his work functioning." (*Id.* at 5.)  Dr. Smith did not provide "the specifics of [his] diagnostic conclusions." (*Id.* at 4.)  However, he did conclude that: "Jerome Johnson is currently substantially incapacitated from performing the essential duties of his usual and customary job assignment as Health Worker III." (*Id.* at 4-5.)  Notwithstanding the foregoing, he "anticipate[d] that an improvement in functioning could occur such that Mr. Johnson would be able to perform the essential job duties in the future" (*id.* at 5), and recommended "an additional 3-6 months of weekly treatment with a professional such as Dr. Lee prior to reconsideration of his fitness for duty." (*Id.* at 6.)

Johnson did not challenge the City's decision to accept Dr. Smith's findings that Johnson was unfit to perform his essential job duties.  (Brown Dec. ¶ 11.)  By letter dated December 22, 2009, Brown informed Johnson that Johnson would remain on compulsory sick leave until at least April 30, 2010.  (*Id.*, Ex. A)

On or about May 14, 2010, the City sent Johnson a letter informing him that he could be medically separated from his employment with the City, and setting an interactive meeting on May 21, 2010 to provide Johnson with an opportunity to raise any objections or concerns and to provide documentation as to why the City should not proceed with his medical separation.  (Complaint, Ex. D; Dkt. No. 50, Ex. I, at 106-07.)  Johnson attended the May 21, 2010 interactive meeting but did

1   not present any information as to why the City should not proceed with a medical separation.  (*See*

2   Complaint, Ex. D; Johnson Dep. at 71:4-18.)  Based on the information the City had, it medically

3   separated Johnson from his employment effective May 21, 2010.  (Complaint, Ex. D.)[4]

4         **B.**   **ADMINISTRATIVE EXHAUSTION**

5        Johnson filed a complaint with the California Department of Fair Employment and Housing

6   ("DFEH") alleging that he was terminated based upon a perceived disability, Schizoaffective

7   Disorder.  (Complaint at 7-12.)  By letter dated October 7, 2010, DFEH issued Johnson a Right-To-

8   Sue Notice, and advised Johnson that it had forwarded his case to the Equal Employment

9   Opportunity Commission ("EEOC") and closed his DFEH case.  (*Id.* at 6.)  EEOC issued a Notice-

10  of-Right-to Sue letter dated June 21, 2011, notifying Johnson of his right to institute a civil action

11  under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 *et seq.*  (*Id.* at 4.)

12  Johnson commenced this civil action on August 19, 2011, within 90 days of receiving the notice of

13  right to sue letter from EEOC.[5]

14  **II.**    **LEGAL STANDARD**

15       Summary judgment is appropriate when there is no genuine issue as to any material fact and

16  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v.*

17  *Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if its proof or disproof is essential to an

18  element of a plaintiff's claim, and a dispute is genuine if the evidence is such that it could lead a

19  reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

20  248 (1986).  A court considering a motion for summary judgment must view the facts in the light

21

22  ───────────────────
[4] In August and September 2010, Johnson appeared at the offices of both the Department of Public Health

23  and Department of Human Resources to discuss his separation and repeatedly engaged in highly aggressive,
    angry and threatening behavior with numerous City employees.  His behavior caused several City employees

24  to have significant concern for their workplace safety.  The City sought and obtained restraining orders
    against Johnson on behalf of these City employees prohibiting violence or threats of violence.  *See City and*

25  *County of San Francisco v. Johnson*, San Francisco Superior Court Case No. CCH-10-571284.  Those
    injunctions expire in October 2013.

26  [5] Johnson's Complaint states that it is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

27  2000-e5 rather than Title I of the Americans with Disabilities Act.  Because Plaintiff, who is proceeding *pro*
    *se*, was provided a right to sue letter under the Americans with Disabilities Act and this is an action for

28  disability discrimination, the Court will construe Plaintiff's claims as having been brought under the
    Americans with Disabilities Act.

most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, *supra*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, point to specific evidence demonstrating that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Liberty Lobby*, *supra*, 477 U.S. at 250. "[A]t this stage of litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact" nor make "credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Liberty Lobby*, *supra*, 477 U.S. at 253). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and the moving party is entitled to judgment as a matter of law. *Matsushita*, *supra* , 475 U.S. at 587 (internal citation omitted).

## III.    DISCUSSION

The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, prohibits employers from discriminating against individuals on the basis of their disabilities.   Under the ADA, no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id*. § 12112. A "qualified individual" under the ADA is an individual capable of performing the essential functions of the employment position either with or without reasonable accommodation. *Id*. § 12111. Under the ADA the word "disability" is used as a term of art. *See Sanders v. Arneson Products, Inc.*, 91 F.3d 1351, 1354 n.2 (9th Cir. 1996). "[A] person may be 'disabled' in the ordinary usage sense, or even for purposes of receiving disability benefits from the

1    government, yet still not be 'disabled' under the ADA." *Id.*  The ADA defines "disability," with

2    respect to an individual as:  "a physical or mental impairment that substantially limits one or more

3    … major life activities"; having "a record of such an impairment"; or "being regarded as having

4    such an impairment."  42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).

5         The City placed Johnson on compulsory sick leave because of his behavior in the workplace

6    and sent him for a fitness for duty evaluation.  Plaintiff took two Fitness for Duty Exams and both

7    psychologists found that Plaintiff was incapacitated and not fit for duty.  Based on this information,

8    the City terminated his employment.  Johnson alleges that this is discrimination and retaliation on

9    the basis of a perceived disability.[6]

10        **A.    DISABILITY DISCRIMINATION**

11        To establish a prima facie case[7] of disability discrimination under the ADA based upon a

12   perceived disability, Johnson must prove three elements, specifically, that he was:  (a) "regarded

13   as" disabled; (b) a "qualified individual"; and (c) subject to an adverse employment action because

14   of his perceived disability.  *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).  As the

15   Plaintiff in this case, Johnson bears the burden to produce evidence to prove each of these elements.

16   *See Cooper v. Neiman Marcus Group*, 125 F.3d 786, 790 (9th Cir. 1997).  Therefore, the City's

17   burden on summary judgment is to show the absence of evidence to support any one of these

18   elements.[8]  If the City meets this burden, the City will be entitled to summary judgment unless

19   Plaintiff can point to specific evidence showing that there is some genuine issue of fact for trial.

20        With respect to Johnson's own motion for summary judgment, the Court follows a 3-step

21   process.  First, he must identify uncontroverted record evidence to prove each element of his prima

United States District Court
Northern District of California

---

[6] It appears that Plaintiff believes that he was terminated without just cause.  However, because his lawsuit alleges disability discrimination and retaliation under the ADA, the Court must analyze his claims within the framework of the ADA.

[7] "Prima facie case" means production of enough evidence to allow a jury to infer a fact—here disability discrimination—and rule in that party's favor.  *See* BLACK'S LAW DICTIONARY (9th ed. 2009).  This presumption remains only so long as there is no evidence to the contrary.

[8] For example, because Johnson has the burden to show that he was a "qualified individual," the City's burden on summary judgment does not require it to prove that Johnson was not a "qualified individual."  Rather, the City's burden on summary judgment is to show that Johnson cannot produce evidence to meet his burden of proof at trial as to <u>one</u> or more elements at issue.  To avoid summary judgment, Johnson then must point to evidence that shows there is some issue of fact for a jury to decide as to each element.

1   facie case of disability discrimination.  If Johnson is able to make a prima facie showing of

2   discrimination, then in Step Two, the burden shifts to the City to provide a legitimate,

3   nondiscriminatory reason for his termination.  If the City provides a legitimate explanation for

4   Johnson's discharge, the presumption of unlawful discrimination "simply drops out of the picture,"

5   and Johnson bears the final burden (Step Three) to produce "specific, substantial evidence" that the

6   stated reason was pretext.  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

7          1.   <u>Step One</u>:  *Prima facie case.*

8            a)   <u>Step One, Part (a)</u>:  *Whether Johnson was "regarded as" disabled?*

9            The first issue is whether the City perceived that Johnson was disabled.  To

10   be "regarded as" disabled under the ADA, "it is necessary that a covered entity entertain

11   misperceptions about the individual."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999),

12   superseded by statute on other grounds, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122

13   Stat. 3553, as recognized in *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850,

14   861-62 (9th Cir. 2009).  A misperception exists if an employer believes "either that one has a

15   substantially limiting impairment that one does not have or that one has a substantially limiting

16   impairment when, in fact, the impairment is not so limiting."  *Id.*  A substantially limiting

17   impairment is one that prevents a person from performing a major life activity or significantly

18   restricts the condition, manner, or duration of a person's ability to perform a major life activity.  29

19   C.F.R. § 1630.2(j)(1).  Major life activities include "seeing, hearing, eating, sleeping, walking,

20   standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, *concentrating*,

21   *thinking*, *communicating, interacting with others, and working*."  *Id*. § 1630.2(i) (emphasis

22   supplied).

23        The City argues that there is no evidence that Johnson was "regarded as" being disabled.

24   Defendant has provided declarations from Brown—who requested Johnson's fitness for duty

25   evaluation—and Trotz—who authorized that request and also authorized placing Johnson on

26   compulsory sick leave—that they took these actions because they believed that Johnson was not

27   medically competent to perform his job, but that they did not believe Johnson was disabled.  (Trotz

28

United States District Court
Northern District of California

1   Dec. ¶¶ 12-15; Brown Dec. ¶ 39, Ex. B.)[9]  Additionally, the City proffers Johnson's deposition

2   testimony where he testified that he has no evidence that the City regarded him as unable to

3   perform a major life activity that the average person in the general population can perform; or

4   significantly restricted as to the condition, manner, or duration of his ability to perform a major life

5   activity compared to an average person.  (Johnson Dep. at 117:17-118:8.)

6          Johnson argues that the City believed that he had a psychiatric condition called

7   Schizoaffective Disorder.  (*See* Plaintiff's Opp'n, Dkt. No. 49, at 3.)  Persons suffering from

8   Schizoaffective Disorder present symptoms of schizophrenia.  STEDMAN'S MED. DICTIONARY (27th

9   ed. 2000).  EEOC regulations provide that schizophrenia will consistently meet the definition of

10  "disability" under the ADA because "schizophrenia substantially limit[s] brain function."  29

11  C.F.R. § 1630.2(j)(3)(iii).  Plaintiff claims Dr. Henderson diagnosed Plaintiff with Schizoaffective

12  Disorder.  (*See* Complaint, Ex. C.)  In support, Plaintiff points to the City's interrogatory response

13  that "Plaintiff's medical condition, as diagnosed by doctors Henderson and Smith, was …

14  discussed[10] with respect to the decision to separate Plaintiff from his position with the City."  (Dkt.

15  No. 47-5, Declaration of Na'il Benjamin, Ex. C, Interrogatory Resp. No. 7, *see also*, *id.* ("Plaintiff's

16  medical condition was discussed with respect to the decision to place him on compulsory sick

17  leave, and the decision to terminate his employment, because Plaintiff's medical condition is the

18  only reason those actions were taken").)

19

20  _____

21  [9] Johnson appears to believe that requiring him to undergo a fitness for duty evaluation is itself a violation of the ADA.  Under the ADA, an employer "shall not require a medical examination and shall not make

22  inquiries of an employee as to whether such an employee is an individual with a disability or as to the nature or severity of the disability, unless such examination is shown to be job-related and consistent with business

23  necessity."  42 U.S.C. § 12112(d)(4)(A). Employers "may make inquiries into the ability of an employee to perform job-related functions."  *Id.* § 12112(d)(4)(B).  Both of the fitness for duty evaluations were

24  permissible because both inquired into Johnson's ability to perform job-related functions, consistent with business necessity.

25  [10] The psychologists who evaluated Johnson informed the City that Johnson had a "psychiatric disorder" that prevented him from performing his job duties.  It does not appear that either psychologist disclosed the

26  medical cause of Johnson's psychiatric disorder.  Pursuant to California's Confidentiality of Medical Act, Cal. Civ. Code § 56.10(c)(8)(B), a psychologist may disclose only a description of "functional limitations"

27  of an employee's ability to work or continue to work, but not the "medical cause."  *See Pettus v. Cole*, 49 Cal. App. 4th 402, 425-26 (Cal. Ct. App. 1996).  Based on the reports submitted into evidence, it appears

28  that both psychologists complied with this law and did not disclose their diagnoses to the City.

At best, Johnson has produced more than a scintilla of evidence sufficient to withstand the City's Motion for Summary Judgment on the "regarded as" prong.  However, the evidence is not sufficient to prove this issue as a matter of law for the benefit of Plaintiff.  Accordingly, on this basis alone, Plaintiff's motion for summary judgment fails.

> b)    _Step One, Part (b)_:  Whether Johnson was a "qualified individual" under the ADA?

The second prong of a prima facie case of disability discrimination requires Johnson to prove that as of May 21, 2010, he was a "qualified individual" under the ADA, which means that he was capable of performing the essential functions of the job either with or without reasonable accommodation.  42 U.S.C. § 12111(8).

The City has produced evidence that shows that at the time the City placed Johnson on medical leave, Johnson was not a "qualified individual" as that term is defined by the ADA.  This evidence begins with the reports of two psychologists concluding that Johnson was unable to perform his job with or without reasonable accommodation.  Consistent with the psychologists' reports were the contemporaneously recorded statements of coworkers describing Johnson's erratic behavior.  Critically, in May 2010, prior to his medical separation, Johnson was required to provide the City with evidence that he was capable of returning to work and performing his job duties; this he did not do.  Finally, like most jobs, attendance was an essential part of Johnson's job at HUH.  Johnson worked only a few weeks at HUH, but the uncontroverted record evidence shows that while assigned to work at HUH, Johnson left work early on many days and was absent on many others.  (Trotz Dec. ¶ 11.)

In opposition, Johnson proffers the following:  First, Johnson argues that because his supervisor assigned him work in April of 2009, the City must have had confidence in his ability to perform that work.  Second, Johnson points to the October 2009 cursory notes from his personal physician and personal therapist deeming him fit to return to work.  (_See_ Brown Dec., Ex. A, attach. 4 ("There are no mental health issues which prevent Mr. Johnson from returning to full-time

12

1    employment.").)  Finally, Johnson argues that when he took time off in April 2009, he received

2    approval to take this time off.[11]

3         While this evidence from April and October of 2009 may, at best, raise a triable issue of fact

4    on the issue of whether he was a "qualified individual" at that time, it is insufficient to raise a

5    triable issue for any alleged adverse employment action that took place in May of 2010.  *See*

6    *Bradley*, *supra*, 104 F.3d at 270 ("an employee's subjective personal judgments of h[is]

7    competence alone do not raise a genuine issue of material fact").

8                         c)    *Step One, Part (c)*:  *Whether Johnson was terminated because of a*

9                                   *perceived disability?*

10        The final prong of a prima facie showing of disability discrimination requires

11   Johnson to show that he was terminated because of a perceived disability.

12        In May 2010, Johnson failed to provide the City with evidence that he was capable of

13   returning to work and performing his job duties, so the City medically separated Johnson from his

14   employment.  Plaintiff appears to primarily rely upon the City's interrogatory response that

15   "Plaintiff's medical condition was discussed with respect to the decision to place him on

16   compulsory sick leave, and the decision to terminate his employment, because Plaintiff's medical

17   condition is the only reason those actions were taken."  (Interrogatory Resp. No. 7.)  However, that

18   reliance is incomplete.  The interrogatory response continues:

19            Plaintiff completed two fitness for duty exams (Dr. Henderson and Dr. Smith) and it
             was determined that Plaintiff was not fit for duty due to incapacitation.  Plaintiff
20            was prescribed a treatment plan but he did not complete that plan as far as the City knew.
             Plaintiff refused to seek a reasonable accommodation and did not adequately
21            participate in an interactive process.  Plaintiff was provided opportunities to meet
             with the Director's designee to discuss the recommendation to separate Plaintiff
22            from his employment due to his inability to do his job and his failure to seek a
             reasonable accommodation; and/or the City's inability to provide a reasonable
23            accommodation; or the absence of an accommodation given the nature of Mr.
24

25   _____

     [11] Johnson also argues that "no concerns about my work performance were brought to my attention."  (Pl.'s
26   Opp'n 3.)  Johnson does not cite to record evidence in making this argument, which is contradicted by
     evidence of a May 11, 2009 meeting held to discuss concerns that Johnson was having difficulty performing
27   his job.  Indeed, it was precisely because Johnson's supervisors believed that he was unable to perform his
     work that they placed Johnson on compulsory medical leave and evaluated his fitness for duty.  Johnson was
28   evaluated by two psychologists who made individualized assessments that Johnson could not perform his
     job duties.

Johnson's diagnosed incapacity.  Plaintiff refused to avail himself of that meeting so
he was terminated from his employment.

*Id.*  Johnson has provided the Court with no evidence from the May 2010 time period from which
any reasonable juror could infer that the alleged "perceived disability" was the motivating reason
for the termination.

2.    *Step 2*:  *Legitimate nondiscriminatory reason for termination.*

Even if Plaintiff could state a prima facie case, the City has offered a legitimate
explanation for Johnson's medical separation:  Johnson was unable to perform his work at HUH.
Two psychologists evaluated Johnson and deemed him unable to perform the essential duties of his
job.  A treatment plan was prescribed and no evidence exists that Plaintiff complied with that plan
to address the issues regarding his ability to perform his job duties.  Further, the ADA only requires
employers to accommodate individuals with disabilities, which Johnson alleges he did not have.
*See Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1232-33 (9th Cir. 2003).  Thus, while the City
was under no obligation to accommodate Johnson, it attempted to do so, through the interactive
process in May 2010, before terminating his employment.  Johnson did not engage.  Thus,
irrespective of whether the City's determination that Johnson could not perform his job was correct,
a legitimate, nondiscriminatory reason to terminate him existed.

Once, the City has presented a legitimate, nondiscriminatory reason for Johnson's
termination, the burden shifts to Johnson to show that the stated reason for his termination is not
worthy of credence.  *Bradley*, *supra*, 104 F.3d at 270.

3.    *Step 3*:  *Pretext analysis.*

To withstand a motion for summary judgment, Johnson must produce "specific,
substantial evidence" that the City's stated non-discriminatory reason for his termination was
pretext.  *Bradley*, *supra*, 104 F.3d at 270.  Here, Johnson bears the ultimate burden of producing
evidence that he has been the victim of illegal discrimination based on a perceived disability.  *See
Gomez v. Am. Bldg. Maint.*, 940 F. Supp. 255, 257 (N.D. Cal. 1996) (citing *St. Mary's Honor Ctr.
v. Hicks*, 509 U.S. 502, 506-11 (1993)).

Johnson does not argue or point to any evidence to show that the stated reason was pretext,
only that the decision was incorrect.  The only evidence Johnson proffered was to show that he was

1   a "qualified individual" capable of performing his essential job functions (*i.e.*, Johnson was

2   assigned work in April 2009 and his treating therapist deemed him fit to return to work in October

3   2009), which is not "specific, substantial evidence" of pretext, and therefore is not sufficient to

4   withstand summary judgment.

5          In conclusion, based upon the analysis set forth above, the Court finds that Johnson has

6   failed to meet his burden of showing there is a genuine issue of fact for trial as to the claim for

7   disability discrimination.  Therefore, the City is entitled to summary judgment.

8          **B.     RETALIATION**

9          Johnson also alleges retaliation.  In a retaliation claim, a plaintiff must demonstrate that he

10  engaged in a protected activity, and suffered an adverse employment action as a result.

11         Here, Johnson has not articulated the basis on which he believes he was retaliated against.

12  He was questioned on this issue at deposition, and it appears that he felt discriminated against and

13  believed that this is retaliation.  (*See* Johnson Dep. at 90:1-97:16.)  The retaliation section of the

14  ADA protects an employee from retaliation for exercising rights under the ADA.  Here, no

15  evidence is proffered that Johnson exercised any rights under the ADA, or that the City took action

16  against Johnson in retaliation.  Johnson does not allege that he requested an accommodation, and

17  prior to this lawsuit, there is no evidence that Johnson accused the City of disability discrimination

18  or that the City knew Johnson felt he was the victim of disability discrimination.

19         Based on the foregoing analysis, the Court finds that the City is entitled to summary

20  judgment on Johnson's claim for retaliation under the ADA.

21  **IV.    CONCLUSION**

22         For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary

23  Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

24         The Court will enter judgment by separate Order.

25         This Order Terminates Docket Numbers 46, 54 & 56.

26         **IT IS SO ORDERED**.

27  **Dated:**  October 17, 2012                     _____

28                                                  **YVONNE GONZALEZ ROGERS**
                                                    **UNITED STATES DISTRICT COURT JUDGE**